DAN RAYFIELD
Attorney General
LEANNE HARTMANN #257503
BRIAN SIMMONDS MARSHALL #196129
JOSEPH PLATT #262461
Senior Assistant Attorneys General
GALEN KNOWLES #T26051501, WSBA 59644
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Telephone: (971) 673-1880
Fax: (971) 673-5000
Email: Leanne.Hartmann@doj.oregon.gov
        Brian.S.Marshall@doj.oregon.gov
        Joseph.Platt@doj.oregon.gov
        Galen.Knowles@doj.oregon.gov

*Attorneys for the State of Oregon*

[Additional counsel to appear on signature page]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| STATE OF OREGON; STATE OF NEW YORK; STATE OF CALIFORNIA; STATE OF CONNECTICUT; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MINNESOTA; STATE OF RHODE ISLAND; STATE OF VERMONT, | Case No._____3:26-cv-1672_____ |
| Plaintiffs, | |
| v. | COMPLAINT |
| OFFICE OF THE COMPTROLLER OF THE CURRENCY and JONATHAN V. GOULD, in his official capacity as Comptroller of the Currency, | |
| Defendants. | |

Page 1 -  COMPLAINT

## I.    INTRODUCTION

1.    In the United States' federalist system, states are the vanguard of consumer protection, enacting laws prohibiting unfair, deceptive, or abusive practices, preventing usurious consumer lending, operating licensing regimes governing numerous consumer finance markets, and adopting new statutory and legislative frameworks to address risks posed to consumers.

2.    Both Congress and the courts have repeatedly acted to preserve states' central role in protecting consumers, including enacting legislation to block attempts by national banks and their prudential regulator, the Office of the Comptroller of the Currency (OCC), to circumvent or otherwise limit state laws aimed at protecting borrowers and other consumers. In the past two decades alone, Congress has overridden OCC rules aimed at gutting state lending protections and adopted statutory limits on the OCC's preemptive power, while the Supreme Court has invalidated OCC regulations aimed at preventing states from enforcing generally applicable laws and rejected efforts by the OCC to preempt state consumer protections.

3.    This case concerns the latest instance of OCC overreach. Plaintiff States bring this action to preserve their role in protecting consumers from predatory practices, including practices engaged in by national banks regulated by the OCC.

4.    Beginning in the 1930s, mortgage lenders, both banks and nonbanks, have generally required borrowers to make monthly payments into escrow accounts to cover annual or semi-annual payment of property taxes and home insurance premiums. However, lenders often required significantly larger deposits than necessary, inflating the interest-free loans lenders received from their borrowers through the use of escrow accounts. To address these abuses, since at least the 1970s, Plaintiff States have enacted and enforced laws requiring lenders to pay borrowers modest amounts of interest on funds held in escrow (interest-on-escrow laws). Such laws are a long-standing feature of the United States' dual-banking system. Many of these state laws have been in place for over 50 years, and courts have a long history of upholding them against preemption challenges.

Page 2 -    COMPLAINT

5.      National banks are established and regulated by the OCC, while state banks are established and regulated by state financial regulators. Each are "subject to the laws of the State" and "governed in their daily course of business far more by the laws of the State than of the nation." *First Nat. Bank v. Kentucky*, 76 U.S. 353, 362 (1869).

6.      Indeed, when Congress amended federal laws governing escrow accounts for certain types of mortgages nearly twenty years ago, it made clear that national banks operating such accounts must pay interest as required by applicable state or federal laws.

7.      Despite this long history, on May 15, 2026, the OCC issued two final rules that together purport to preempt state interest-on-escrow laws across the board as applied to national banks and federal savings associations.

8.      One of two rules promulgated by the OCC, the Preemption Rule, purports to make a "preemption determination" that New York's interest-on-escrow law, and thirteen "substantively equivalent" laws across the country, are preempted by federal law. Preemption Determination: State Interest-on-Escrow Laws, 91 Fed. Reg. 29350, 29356–57 (May 19, 2026) (to be codified at 12 C.F.R. § 34.7).

9.      In support, the Preemption Rule asserts that state interest-on-escrow laws significantly interfere with national banks' exercise of their federal powers, ostensibly applying a preemption test first articulated by the Supreme Court in *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25 (1996), and codified by Congress in the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §§ 5301–5641. The Preemption Rule misapplies the *Barnett Bank* test, and the Rule's significant-interference conclusion is directly at odds with the Ninth Circuit's decision in *Lusnak v. Bank of America, N.A.*, 883 F.3d 1185 (9th Cir. 2018). There, the court rejected a preemption challenge to California's interest-on-escrow statute and held that "no legal authority establishes that state escrow interest laws prevent or significantly interfere with the exercise of national bank powers, and Congress itself, in enacting Dodd-Frank, has indicated that they do not." *Id.* at 1197. The Preemption Rule also was proposed in the wake of the Supreme Court's decision in *Cantero v. Bank of America, N.A.*, in which the Court rejected the Second

Page 3 -    COMPLAINT

Circuit's "categorical test" for national bank preemption that would "preempt virtually all state laws that regulate national banks." 602 U.S. 205, 220–21 (2024).

10.    Transparently aware that existing precedent did not support the Preemption Rule's proposed determination, the OCC simultaneously adopted a second rule, the Escrow Powers Rule, that purports to "codify" a national bank power "to establish and maintain escrow accounts" and "clarify that the terms and conditions of escrow accounts, including the extent of any compensation paid to customers, are business decisions to be made by each bank." Real Estate Lending Escrow Accounts, 91 Fed. Reg. 29340, 29345 (May 19, 2026) (to be codified at 12 C.F.R. § 34.3(d)).

11.    The Escrow Powers Rule, despite declaring an intention to codify banks' "flexibility . . . to organize and manage escrow accounts," 91 Fed. Reg. at 29345, engages in no substantive effort to identify or demonstrate any ongoing interference with national banks' operations of escrow accounts. It cites no evidence nor identifies any market disruptions. And, critically, it makes no effort to explain how the Escrow Powers Rule will protect consumers from abuse. Instead, it exists solely as a pretext to manufacture a conflict between this new federal rule and state interest-on-escrow laws, a fact that the Preemption Rule makes clear when purporting to find a conflict between such laws and federal law. *See* 91 Fed. Reg. at 29356 (announcing that such a conflict "is especially clear in light of the OCC's concurrent Escrow Powers Rule").

12.    Accordingly, the Escrow Powers and Preemption Rules (together, the Rules) are contrary to law and arbitrary and capricious under the Administrative Procedure Act (APA) for numerous reasons.

13.    First, the Rules exceed the OCC's rulemaking authority. The agency seeks to create a broad new national bank power in the Escrow Powers Rule for the sole purpose of preempting state laws in the concurrently issued Preemption Rule. Congress has not delegated such boundless authority to the OCC. To the contrary, Congress placed strict substantive and procedural limits on the OCC's ability to make preemption determinations when it enacted Dodd-Frank.

14.    Second, the Rules fail to comply with Dodd-Frank's substantive preemption requirements, which codified the *Barnett Bank* test. The Rules deem state interest-on-escrow laws

Page 4 -    COMPLAINT

preempted because they supposedly impair national banks' "flexibility" to set all terms of escrow accounts. Dodd-Frank and *Barnett Bank* instead instruct the OCC to consider whether a state law "prevents or substantially interferes" with a national bank power. Applying that standard, state interest-on-escrow laws are not preempted because they only minimally affect national bank operations.

15.    Third, the Rules contradict the Supreme Court's recent holding that preemption determinations under Dodd-Frank require an individualized analysis of the nature and degree of a state law's interference with national bank powers. *See Cantero*, 602 U.S. at 219–21 (vacating Second Circuit's decision holding that National Bank Act preempts New York's interest-on-escrow law). Specifically, by manufacturing a conflict, the Rules effectively create a categorical test that preempts all state interest-on-escrow laws regardless of how much they interfere with national bank operations—the exact approach the Supreme Court explicitly rejected.

16.    Fourth, the Rules fail to comply with Dodd-Frank's procedural preemption requirements. The Rules are not supported by any evidence, much less the "substantial evidence" required by Dodd-Frank. *See* 91 Fed. Reg. 29350 at 29352 & n.22 (dismissing commenters' concerns that Preemption Rule "was not supported by substantial evidence" on the ground that "preemption is fundamentally a question of law" and confirming that "[t]he OCC has not relied on any technical studies or data for its analysis"). And the OCC failed to conduct the required case-by-case analysis of the states' laws, instead analyzing only New York's interest-on-escrow statute and lumping the remaining thirteen laws together without any reasoning.

17.    Fifth, the Rules are arbitrary and capricious under the APA. They lack any factual basis, are based on unsupported speculation, and fail to meaningfully consider how they harm consumers and the financial system.

18.    For the reasons set forth in this Complaint, Plaintiffs are entitled to a judgment that declares unlawful and vacates the Escrow Power Rule and the Preemption Rule.

Page 5 -    COMPLAINT

## II.    JURISDICTION AND VENUE

19.    The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and the APA, 5 U.S.C. § 702.

20.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2), (e)(1) and 5 U.S.C. § 703. Defendants include a United States officer sued in his official capacity. The State of Oregon, including the Oregon Department of Justice, resides in the District of Oregon, and a substantial part of the events giving rise to this Complaint occurred and continue to occur within this district.

## III.    PARTIES

### A.    Plaintiffs

21.    Plaintiff the State of Oregon is a sovereign state of the United States of America. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

22.    Plaintiff the State of New York is a sovereign State of the United States of America. New York is represented by Attorney General Letitia James, who is New York's chief law enforcement officer, and as such is authorized to institute this action. N.Y. Exec. Law § 63.

23.    Plaintiff the State of California is a sovereign state of the United States of America. California is represented by Attorney General Rob Bonta. The Attorney General is the chief law officer of the state and is authorized to pursue this action by California State Constitution, article V. section 13.

24.    Plaintiff State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

25.    Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

26.     Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown who is the chief legal officer of Maryland.

27.     Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States. Massachusetts is represented by Andrea Joy Campbell, the Attorney General of Massachusetts, who is the chief law officer of Massachusetts and authorized to pursue this action on its behalf.

28.     Plaintiff State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

29.     Plaintiff State of Rhode Island is a sovereign state of the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

30.     Plaintiff State of Vermont is a sovereign state of the United States. Vermont is represented by Attorney General Charity Clark. Attorney General Clark is authorized to initiate litigation on Vermont's behalf.

**B.     Defendants**

31.     Defendant the Office of the Comptroller of the Currency is an agency of the United States. *See* 5 U.S.C. § 701(b)(1). The OCC is a bureau within the United States Department of the Treasury that "is charged with assuring the safety and soundness of, and compliance with laws and regulations, fair access to financial services, and fair treatment of customers by, the institutions and other persons subject to its jurisdiction." 12 U.S.C. § 1(a).

32.     Defendant Jonathan V. Gould is the Comptroller of the Currency. He is sued in his official capacity. As Comptroller, Defendant Gould is the "chief officer" of the OCC. *Id.* § 1(b)(1).

Page 7 -   COMPLAINT

## IV.    ALLEGATIONS

**A.    State Interest-on-Escrow Laws Prevent Mortgage Lending Abuses**

33.    Since the late 1930s, state and national banks making mortgage loans have typically required consumers to deposit funds into escrow accounts to cover property taxes and home insurance premiums associated with the property, in addition to making monthly principal and interest payments. Ensuring timely payment of property taxes and insurance premiums, through the use of escrow accounts, benefits banks by protecting mortgage loans' collateral.

34.    As of 2016, about 80% of mortgages had an escrow account associated with them. *See* Fed. H. Fin. Agency & Consumer Fin. Prot. Bureau, Technical Report 6.0, *A Profile of 2016 Mortgage Borrowers: Statistics from the National Survey of Mortgage Originations,* 30 (2018), https://files.consumerfinance.gov/f/documents/cfpb_NMDB-technical-report_6.0.pdf [https://perma.cc/9K56-AWCF]. For borrowers with a credit score below 620, that number was about 88%. *Id.*

35.    Because homeowners make escrow payments monthly, but property taxes and insurance premiums are generally paid out of escrow annually or semi-annually, escrow accounts often carry significant positive balances throughout the year. Those positive balances grew as banks required deposit of larger amounts ever further in advance of when payments were due. Banks were thus obtaining "interest-free" loans from their own consumers, and the banks could use the escrow account deposits to earn revenue.

36.    In response to growing consumer concerns about these abuses, Congress enacted the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601–2617, in 1974. RESPA limits the amount banks can require borrowers to deposit into an escrow account over a 12-month period to the estimated total of taxes, insurance, and other items to be paid for the period plus a cushion of one-sixth of that total. 12 U.S.C. § 2609(a). RESPA also requires that lenders provide initial and annual statements to borrowers detailing the estimated and actual taxes, insurance premiums, and other charges paid by the account. *Id.* § 2609(c). Lenders must also promptly return

Page 8 -    COMPLAINT

to the borrower any balance on an escrow account once the underlying loan is paid in full. 12 U.S.C. § 2605(g).

37.     RESPA is silent on whether lenders should pay borrowers interest on escrow accounts. RESPA, moreover, provides that federal law "does not annul, alter, or affect, or exempt" national banks "from complying with the laws of any State with respect to settlement practices" except "to the extent those laws are inconsistent" with the federal statute. 12 U.S.C. § 2616. And RESPA further and expressly provides that any state law that "gives greater protection to the consumer" is not "inconsistent with any provision" of RESPA. *Id.*

38.     Around the same time as RESPA's enactment, many states passed laws requiring banks to pay their customers minimum amounts of interest on the money deposited into escrow accounts.

39.     The state interest-on-escrow statutes referenced in the Preemption Rule all deal at a high level with the extent to which a national bank must pay interest on escrow deposits. But the terms and mechanisms of the laws vary widely.

40.     California's interest-on-escrow statute, enacted in 1976, requires lenders to pay borrowers at least 2% interest on funds paid into an escrow account and prohibits lenders from imposing maintenance or disbursement fees that would result in the borrower receiving less than 2% interest on the funds paid into the account. Cal. Civ. Code § 2954.8.

41.     Connecticut requires lenders to pay borrowers with an escrow account interest at an adjustable rate not less than the average of the national rates for savings deposits and money market deposits for the prior year. Conn. Gen. Stat. § 49-2a; *see also* Conn. Gen. Stat. § 36a-26.

42.     Maine's interest-on-escrow statute, enacted in 1979, requires lenders to pay borrowers interest at a rate not less than 50% of the 1-year Treasury Bill secondary market rate and prohibits lenders from imposing service charges on the maintenance of escrow accounts. 9-B Me. Rev. Stat. Ann. § 429; 33 Me. Rev. Stat. Ann. § 504.

43.     Maryland requires lenders pay borrowers annual interest at a rate not less than the weekly average yield on U.S. Treasury securities adjusted to a constant maturity of one year and

Page 9 -    COMPLAINT

prohibits lenders from imposing collection or service charges for escrow accounts on a first mortgage. Md. Code Ann., Com. Law §§ 12-109(b)(1), 12-109.2(c).

44. Massachusetts requires lenders to pay interest for escrow accounts on first mortgages at a rate determined by the lender. Mass. Gen. Laws ch. 183, § 61.

45. Minnesota requires lenders to pay borrowers at least 3% interest on funds paid into escrow accounts created in conjunction with mortgage loans made prior to July 1, 1996. Minn. Stat. Ann. § 47.20, subd. 9(a).

46. New York's interest-on-escrow statute, enacted in 1974, requires lenders pay borrowers interest on the funds deposited into an escrow account at a rate of 2% or at a rate set by the superintendent of financial services, whichever is higher. N.Y. Gen. Oblig. Law § 5-601. New York also prohibits lenders from imposing service charges on the maintenance of escrow accounts. *Id.*

47. Oregon's interest-on-escrow statute, enacted in 1975, requires lenders to pay borrowers interest on funds deposited in an escrow account at a rate not less than the discount rate, which is currently 2.61%. ORS 86.245(2). Oregon also prohibits lenders from imposing service charges on escrow accounts. ORS 86.250.

48. Rhode Island requires lenders to pay borrowers interest at a rate equal to the rate paid on a regular savings account. R.I. Gen. Laws § 19-9-2(a).

49. Vermont requires lenders to pay borrowers interest at a rate equal to the rate paid on a regular savings account, if offered, and otherwise at a rate not less than the prevailing rate offered by local financial institutions. Vt. Stat. Ann. tit. 8, § 10404(b).

50. The purpose of each of these state interest-on-escrow laws is entirely consistent with RESPA, which is to protect consumers and prevent abuses by mortgage lenders, including national banks, by ensuring a disincentive to requiring consumers to pay more than needed into escrow accounts.

51. And indeed, Congress has acquiesced to these state interest-on-escrow laws for decades without passing legislation to preempt them. More recently, when Congress passed

Page 10 - COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Dodd-Frank, it amended section 1639d of the Truth in Lending Act to require national banks to operate escrow accounts for certain types of mortgages. *See* 15 U.S.C. § 1639d. In imposing this requirement, Congress expressly acknowledged and incorporated state interest-on-escrow laws, providing that national banks must "pay interest to the consumer . . . in the manner as prescribed by [an] applicable State or Federal law." 15 U.S.C. § 1639d(g)(3).

**B.     National Bank Act Preemption and Limits Set by Congress**

52.     States have chartered and regulated banks since the founding of the United States.

53.     In 1864, Congress passed the National Bank Act, creating a national banking system that exists alongside the state banking system. The National Bank Act grants national banks certain powers, including the power to accept deposits and make non-real-estate loans, along with "all such incidental powers as shall be necessary to carry on the business of banking." 12 U.S.C. § 24. At first, national banks were prohibited from making mortgage loans, but Congress removed this limitation upon the creation of the Federal Reserve Banks in the early 1900s. The abuses that Congress sought to address through RESPA began to emerge in the decades that followed.

54.     Congress also created the OCC and gave it authority to charter, regulate, and supervise national banks and federal savings associations.

55.     In our dual banking system, banks are either chartered as a state bank by a state financial regulator or as a national bank by the OCC. Notwithstanding a national bank's federal charter, it remains subject to many state banking laws. Indeed, states "have enforced their banking-related laws against national banks" for over 100 years. *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 534 (2009). The Supreme Court has held that only certain state laws, which intrude too far into powers Congress granted national banks, should be preempted by the National Bank Act. Specifically, in *Barnett Bank*, the Supreme Court held that a state law is preempted if it "prevent[s] or significantly interfere[s] with [a] national bank's exercise of its powers." 517 U.S. at 33. The Court made clear that National Bank Act preemption does not "deprive States of the power to regulate national banks." *Id.*

Page 11 -  COMPLAINT

56.     The OCC, however, has long taken a much broader view of National Bank Act preemption than the Supreme Court or Congress. Following *Barnett Bank*, the OCC issued in 2004 a sweeping regulation seeking to preempt fourteen broad categories of state banking law. *See* Bank Activities and Operations; Real Estate Lending and Appraisals, 69 Fed. Reg. 1904 (Jan. 13, 2004). The OCC purported to be applying the preemption standard from *Barnett Bank*. *Id.* at 1910. But instead of using the Supreme Court's "prevent or significantly interfere" test, the OCC took an even broader approach, deeming state banking laws preempted if they "obstruct, impair, or condition a national bank's ability to *fully* exercise its powers to conduct activities authorized under Federal law." *Id.* at 1917 (emphasis added). The OCC's 2004 preemption standard suggested that state banking laws that implicated a national bank power *to any degree* were preempted.

57.     In 2007, the housing market collapsed, plunging the world into a years-long recession. Congress created the Financial Crisis Inquiry Commission to investigate the abusive and risky lending practices in the home mortgage market that were a major contributor to the housing market collapse. The Commission concluded that the OCC's broad preemption efforts contributed to the crisis. The Commission explained that "[n]ot only did the federal banking supervisors fail to rein in risky mortgage lending practices, but the Office of the Comptroller of the Currency and the Office of Thrift Supervision preempted the applicability of state laws and regulatory efforts to national banks and thrifts, thus preventing adequate protection for borrowers and weakening constraints on this segment of the mortgage market." Fin. Crisis Inquiry Comm'n, The Financial Crisis Inquiry Report, at 126 (Jan. 2011), https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

58.     In 2010, Congress enacted Dodd-Frank to address many of the root causes of the financial crisis. "Dodd-Frank brought about a 'sea change' in the law, affecting nearly every corner of the nation's financial markets." *Lusnak*, 883 F.3d at 1189 (citation omitted). Congress was particularly focused on strengthening housing market regulations to prevent another mortgage crisis. *See id.* As part of those reforms, Congress targeted the OCC's preemption efforts, which had immunized national banks from critical state banking regulations. The Senate Committee on

Page 12 -  COMPLAINT

Banking, Housing, and Urban Affairs observed that states, filling a gap left by federal regulators, enacted anti-predatory lending laws, only to be thwarted when "federal regulators preempted them." S. Rep. No. 111-176, at 16 (2010). The OCC thus "actively created an environment where abusive mortgage lending could flourish without State controls." *Id.* at 17.

59. Dodd-Frank rebuked the OCC's prior views on preemption, clarifying that federal banking law "does not occupy the field in any area of State law." 12 U.S.C. § 25b(b)(4). Congress also codified a national bank preemption standard: state consumer financial laws are preempted "only if" they: (1) have a discriminatory effect on national banks as compared to state banks; (2) prevent or significantly interfere with the exercise of national-bank powers "in accordance with the legal standard for preemption in the decision of the Supreme Court of the United States in [*Barnett Bank*]," or (3) are preempted by another federal statute. *Id.* § 25b(b)(1).

60. In addition to codifying *Barnett Bank*'s significant-interference test, Congress in Dodd-Frank prescribed procedures that the OCC must follow when issuing a preemption determination.

61. First, the OCC, in making any preemption determination, must do so "on a case-by-case basis" that evaluates "the impact of a particular State consumer financial law on any national bank that is subject to that law, or the law of any other State with substantively equivalent terms." *Id.* § 25b(b)(1)(B), (b)(3)(A). Further, in determining if two laws have "substantively equivalent terms," the OCC must consult the Consumer Financial Protection Bureau (CFPB) and take the Bureau's views into account. *Id.* § 25b(b)(3)(B).

62. Second, the OCC must not deem a state law preempted "unless substantial evidence, made on the record of the proceeding, supports the specific finding regarding the preemption of such provision in accordance with the" *Barnett Bank* standard. *Id.* § 25b(c). Among other things, this standard requires actual factual development to support any proposed preemption determination and does not permit the OCC to rely solely on hypothetical concerns.

63. Dodd-Frank also limited deference owed to OCC preemption determinations. The statute provides that a reviewing court "shall assess the validity of such determinations, depending

Page 13 - COMPLAINT

upon the thoroughness evident in the consideration of the agency, the validity of the reasoning of the agency, the consistency with other valid determinations made by the agency, and other factors which the court finds persuasive and relevant to its decision." *Id.* § 25b(b)(5)(A).

64.    In other words, at a time when most federal agency actions were subject to the deference articulated by the Supreme Court in *Chevron U.S.A., Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), Congress instead instructed courts to provide the OCC's preemption determinations, at most, only "*Skidmore* deference," under which "an agency's views are 'entitled to respect' only to the extent that they have the 'power to persuade,'" *Lusnak*, 883 F.3d at 1192 (citation omitted).

## C.    Challenges to State Interest-on-Escrow Laws

65.    Since their inception, state interest-on-escrow laws faced challenges seeking to declare the laws preempted. Until recently, none of those challenges succeeded. In *Federal National Mortgage Association v. Lefkowitz*, for example, a federal district court with a three-judge panel dismissed claims brought by a federal mortgage lending institution challenging New York's interest-on-escrow law as preempted. 390 F. Supp. 1364, 1366 (S.D.N.Y. 1975). The court reasoned that New York's law "does not discriminate against . . . federal mortgage lending institution[s]"; that "there is nothing in [the law] which explicitly conflicts with either a federal statute or regulation"; and that the burdens imposed by the law were "insignificant." *Id.* at 1369.

66.    In its omnibus 2004 preemption rule, the OCC attempted to preempt broad categories of state laws, including all state laws "concerning . . . escrow accounts." 69 Fed. Reg. at 1917. Dodd-Frank, however, rejected the OCC's field preemption attempt by making clear that federal banking law "does not occupy the field in *any area of State law*." 12 U.S.C. § 25b(b)(4) (emphasis added). The Supreme Court similarly disavowed the OCC's rationale for the 2004 preemption rule. *See Cuomo*, 557 U.S. at 533 (rejecting OCC's interpretation of National Bank Act that would "exempt national banks from all state banking laws").

67.    In 2018, in the first post-Dodd-Frank ruling on this issue, the Ninth Circuit rejected a preemption challenge to California's interest-on-escrow statute. *Lusnak*, 883 F.3d at 1194.

Page 14 -  COMPLAINT

Applying *Barnett Bank*, the court reasoned that "no legal authority establishes that state escrow interest laws prevent or significantly interfere with the exercise of national bank powers, and Congress itself, in enacting Dodd-Frank, has indicated that they do not." *Id.* at 1197.

68.    In *Cantero v. Bank of America, N.A.*, the Second Circuit disagreed and held that the National Bank Act preempted New York's interest-on-escrow law. 49 F.4th 121, 134 (2d Cir. 2022), *vacated and remanded*, 602 U.S. 205 (2024). The Second Circuit reasoned that New York's law "would target, curtail, and hinder" national banks' "power to create and fund escrow accounts." *Id.* at 134. The court declined to assess the degree to which New York's law burdened national banks because "if taken to a greater degree, state authority to set minimum interest rates could infringe on national banks' power to use mortgage escrow accounts altogether." *Id.*

69.    The Supreme Court, however, granted certiorari in *Cantero* and vacated the Second Circuit's decision. The Court explained that the Second Circuit erred by applying "a categorical test that would preempt virtually all state laws that regulate national banks." *Cantero*, 602 U.S. at 220–21. Instead, the Court instructed that the preemption determination requires "a practical assessment of the nature and degree of the interference caused by a state law" to determine if the law prevents or significantly interferes with a national bank power. *Id.* at 219–20. To aid in this assessment, courts "may consider the interference caused by the state laws" in *Barnett Bank* and the precedents on which *Barnett Bank* relied. *Id.* at 220.

70.    The Ninth Circuit revisited California's interest-on-escrow law after *Cantero*. *See Kivett v. Flagstar Bank, FSB*, 154 F.4th 640 (9th Cir. 2025), *cert. pending*, No. 25-1350 (U.S. June 3, 2026). The court concluded that its prior decision in *Lusnak* holding that California's law was not preempted remained good law after *Cantero*. *Id.* at 649. The court explained that *Lusnak*

Page 15 -  COMPLAINT

properly applied *Barnett Bank* and that its approach was "not inconsistent" with the Supreme Court's holding in *Cantero*. *Id.* at 646, 648.[1]

**D.     The OCC Promulgates Rules Targeting State Interest-on-Escrow Laws**

71.     On December 30, 2025, the OCC issued notices of proposed rulemaking for the Escrow Powers and Preemption Rules. 90 Fed. Reg. 61099, 90 Fed. Reg. 61093. On May 15, 2026, the OCC issued final rules, which were published in the Federal Register on May 19, and which took effect on June 18, 2026. 91 Fed. Reg. 29340, 91 Fed. Reg. 29350. Together, the Rules purport to preempt all state mortgage-on-escrow laws by granting national banks the exclusive power to determine the interest and fees associated with escrow accounts.

72.     The OCC issued a single press release concerning the Rules on May 15, 2026, titled "OCC Issues Two Final Rules on Preemption of State Interest-on-Escrow Laws." OCC News Release 2026-37 (May 15, 2026), https://www.occ.gov/news-issuances/news-releases/2026/nr-occ-2026-37.html [https://perma.cc/2744-WUMK]. The press release states, in relevant part: "The OCC's actions emphasize federal preemption as a critical tool for reducing unnecessary burden, enabling local and national prosperity, and unleashing economic growth." *Id.*

**1.     Escrow Powers Rule**

73.     The Escrow Powers Rule first defines the term "escrow account" as "an account established in connection with a loan or extension of credit secured by a lien on interest in real estate in which the borrower places funds for the purpose of assuring payment of taxes, insurance premiums, or other charges with respect to the property." 91 Fed. Reg. at 29347.

---

[1] Other circuits have split on this issue following the Supreme Court's decision in *Cantero*. The First Circuit, consistent with the Ninth Circuit's ruling, found that the National Bank Act does not preempt Rhode Island's interest-on-escrow law. *See Conti v. Citizens Bank, N.A.*, 157 F.4th 10, 13 (1st Cir. 2025), *cert. denied*, No. 25-1004, 2026 WL 1052171 (U.S. Apr. 20, 2026), *pet. for reh'g pending and resp. requested*, 2026 WL 1640846 (U.S. June 8, 2026). In *Cantero*, the Second Circuit on remand again held that the National Bank Act preempts New York's law, over a vigorous dissent which criticized the majority for conducting "a strained analysis of the Supreme Court's precedents to reach an approach that is just as capacious" as the categorical test rejected by the Supreme Court. *Cantero v. Bank of Am., N.A.*, 175 F.4th 201, 215 (2d Cir. 2026) (Pérez, J., dissenting), *cert. pending*, No. 25-1313 (U.S. May 27, 2026).

Page 16 -  COMPLAINT

74. The Rule next purports to codify a power of national banks to set the terms and conditions of escrow accounts, including any fees associated with such accounts and "whether and to what extent interest or other compensation is calculated and paid to customers whose funds are placed in the escrow account." *Id.* In the OCC's view, the Escrow Powers Rule is necessary to give banks "the flexibility to make the business decisions that adapt to local circumstances and other relevant considerations; otherwise, inefficient and ineffective results are more likely to prevail, which may lead to higher prices and reduced mortgage lending." *Id.* at 29341.

75. The OCC attempts to tie the Escrow Powers Rule to national banks' mortgage lending powers under the National Bank Act, the Federal Reserve Act, and the Home Owners' Loan Act. *Id.* at 29341. But none of these statutes provide national banks with unfettered "discretion" to manage escrow accounts in any way they wish. To the contrary, Congress reined in banks' discretion to manage escrow accounts in RESPA, rejected the OCC's first attempt to preempt state interest-on-escrow laws in Dodd-Frank, and has otherwise left the states' consumer finance laws that deal with escrow accounts undisturbed for five decades.

76. The OCC suggests it is issuing the Escrow Powers Rule "for the sake of clarity" regarding banks' mortgage lending powers. *Id.* at 29341. But as the agency acknowledges in the final rule, the true purpose of the Escrow Powers Rule is to manufacture a conflict with state interest-on-escrow laws and provide a regulatory basis for the Preemption Rule. *See id.* ("[C]odifying these Federal powers makes clear that those State laws also directly conflict with a Federal regulation.").

77. The OCC therefore lacks authority to issue the Escrow Powers Rule. Congress has not delegated to the OCC freestanding power to issue regulations for the purpose of preempting state laws. *See Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A] federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority."). The agency's generic rulemaking authority to, for example, prescribe "restrictions and requirements" for national banks' mortgage lending powers, 12 U.S.C. § 371(a), must be read as limited by Dodd-Frank's later-enacted strict substantive and procedural limitations

Page 17 -  COMPLAINT

for preemption of state consumer financial laws, 12 U.S.C. § 25b(b)–(c). Any contrary interpretation would grant the OCC unchecked authority to preempt any state consumer financial law by using the twin-regulation approach it used here.  This would "upend Dodd-Frank's carefully reticulated [preemption] scheme." *Conti*, 157 F.4th at 21 n.8 (concluding that 12 U.S.C. § 371(a) "does not grant the OCC exclusive oversight" of national bank escrow accounts and that "Congress did not intend" for § 371(a) to divest the states of the "concurrent regulatory power" reserved to them under Dodd-Frank).

78.    Because the purpose of the Escrow Powers Rule is to preempt state banking law, the OCC must also abide by Dodd-Frank's procedural requirements for preemption. Namely, the preemption determination must be supported by "substantial evidence, made on the record of the proceeding." 12 U.S.C. § 25b(c). The Escrow Powers Rule provides no evidence to support its findings. Instead, the Rule speculates without any factual basis that, absent granting banks unrestrained powers over escrow accounts, "banks may . . . offset costs by imposing additional fees, such as origination fees, particularly if escrow account administration becomes more expensive," and "may . . . reduce[] mortgage lending." 91 Fed. Reg. at 29340–41. Nowhere does the Rule identify any actual adverse effects caused by interest-on-escrow laws, which have been in place for decades. The Rule also fails to acknowledge that a hypothetical increase in origination fees and a reduction in mortgage lending cannot serve as a rationale to apply the Rule to *existing* mortgage loans, which have already been originated. The OCC nevertheless applies the Rule to all mortgage loans, existing and future, without explanation.

79.    By the same token, the Escrow Powers Rule is arbitrary and capricious because it is neither reasonable nor reasonably explained. The Rule is based on unsupported speculation, fails to account for how it will harm borrowers and the financial system, and exists merely as a pretext to support the Preemption Rule.

Page 18 -  COMPLAINT

## 2.     Preemption Rule

80.     The Preemption Rule purports to determine that fourteen interest-on-escrow laws are preempted by the authority granted by the Escrow Powers Rule for national banks to determine the amount of interest to pay borrowers on escrow accounts. *See* 91 Fed. Reg. at 29350.

81.     The Preemption Rule analyzes only New York's interest-on-escrow law and determines the law is preempted because it "restrict[s] a national bank's . . . flexibility to decide whether and to what extent to pay interest or other compensation on funds placed in escrow accounts or assess fees for such accounts." *Id.* at 29358. Nominally conducting the comparative analysis required by the Supreme Court in *Cantero*, the agency concludes that New York's law is "more akin" to the state laws the Supreme Court has deemed preempted than the state laws it has not. *Id.* at 29355. In making this determination, the Preemption Rule relies on the Escrow Powers Rule, which the OCC claims "creates a direct conflict" between state interest-on-escrow laws and the Escrow Powers Rule's "expressly codified" power of national banks to set the terms of escrow accounts. *Id.* at 29356; *see also id.* (stating that supposed "conflict" between state and federal law "is especially clear in light of the OCC's concurrent Escrow Powers Rule").

82.     The Rule then deems preempted thirteen other interest-on-escrow laws that the agency finds are "substantively equivalent" to New York's law. *Id.* at 29357. The Preemption Rule does not articulate a standard the agency applied to make its substantive equivalence determinations. Rather, the OCC states that "each state law has the same effect: depriving national banks of the flexibility to exercise the discretion that Federal law, as confirmed in the OCC's Escrow Powers Rule, vests in them." *Id.* Under the OCC's reasoning, therefore, any state law that affects a national bank's "business judgment" in the administration of an escrow account in any way would violate *Barnett Bank*'s significant-interference test.

83.     The OCC further states it "has consulted with the CFPB on whether these State laws have substantively equivalent terms. The CFPB concurred with the OCC's determination and reasoning." *Id.* The Preemption Rule rulemaking record does not contain any explanation of the

Page 19 - COMPLAINT

nature or extent of the OCC's consultation with the CFPB or what standard (if any) the CFPB applied to "concur" with the OCC's substantial equivalence determination.

84.     As a result of the OCC's unreasoned substantial equivalence determination, the Rule deems preempted the interest-on-escrow laws of California, Connecticut, Guam, Maine, Maryland, Massachusetts, Minnesota, Oregon, Rhode Island, U.S. Virgin Islands, Utah, Vermont, and Wisconsin—in addition to New York's law. *See id.* at 29358.

85.     The OCC flouted Dodd-Frank and Supreme Court precedent at every turn in promulgating the Preemption Rule.

86.     First, as explained *supra*, the OCC lacks authority to announce a novel national bank power for the sole (and stated) purpose of fabricating a purported conflict with state consumer finance law.

87.     Second, the Preemption Rule fails to properly apply the Dodd-Frank substantive preemption standard. To start, the Rule does not identify a specific national bank power implicated by New York's law, instead citing only banks' "broad" power to set the terms and conditions on escrow accounts announced in the Escrow Powers Rule. *See id.* at 29354–55. Even assuming such a power exists, the Preemption Rule does not evaluate whether New York's interest-on-escrow statute "prevents or significantly interferes" with the exercise of that power, as required by Dodd-Frank and *Barnett Bank*. Instead, the OCC created a new standard that turns on whether New York's law impairs in any way the "flexibility granted to a national bank under Federal law" or "interferes with a national bank's effectiveness or efficiency in exercising its Federal power." *Id.* at 29354. Under the OCC's framing, all interest-on-escrow laws meet its novel standard because they affect banks' "flexibility" to not pay interest or fees on escrow accounts, even if any asserted interference is slight. But as the First and Ninth Circuits have recognized, interest-on-escrow laws minimally affect bank operations and fall far short of preventing or significantly interfering with national bank powers.

88.     Third, the Preemption Rule is contrary to the Supreme Court's admonishment that Dodd-Frank does not permit a "categorical" or "bright line" preemption test. *Cantero*, 602 U.S. at

Page 20 -  COMPLAINT

220–21. The Preemption Rule is exactly that. In the OCC's view, *any* state regulation of interest and fees on escrow accounts interferes with banks' "flexibility" in setting the terms and conditions of escrow accounts. Categorically, then, interest-on-escrow statutes are preempted, regardless of the degree to which they might interfere. The effect of the Preemption Rule is therefore indistinguishable from the Second Circuit's categorical rule the Supreme Court rejected in *Cantero*. The OCC's approach also fails to follow the Supreme Court's instruction that *Barnett Bank* requires "a practical assessment of the nature and degree of the interference caused by a state law," because, in the agency's view, interest-on-escrow laws are preempted regardless of their degree of interference. *Id.* at 219–20. This reasoning opens the door to de facto field preemption of state banking laws, a result Dodd-Frank expressly prohibits. *See* 12 U.S.C. § 25b(b)(4).

89.    The Preemption Rule also violates Dodd-Frank's procedural requirements for the OCC when issuing any preemption determination concerning a state consumer financial law.

90.    The Rule fails to conduct the required case-by-case preemption analysis. The OCC must perform an individualized assessment of each "particular State consumer financial law" that the OCC intends to preempt, unless the OCC can show that a state law has "substantively equivalent terms" to another state law that the OCC has already lawfully preempted. 12 U.S.C. § 25b(b)(1)(B), (b)(3)(A). The Preemption Rule analyzes only New York's interest-on-escrow law. The Rule then summarily declares all other states' interest-on-escrow laws to have "substantively equivalent terms" without so much as listing those laws' requirements. *See* 91 Fed. Reg. at 29356–57. If it had, it would be clear the laws do not have substantively equivalent terms. For example, many interest-on-escrow laws have variable interest rates. Oregon's interest rate is tied to the auction rate for U.S. Treasury bills and thus in certain years has required banks to pay no interest at all. *See* ORS 86.245(2). Connecticut's and Rhode Island's laws are tied to savings account interest rates and, as of 2026, require interest payments at rates significantly below 1%. Conn. Gen. Stat. § 49-2a; R.I. Gen. Laws § 19-9-2(a). Other states set fixed interest rates of 2 or 3%. *See* N.Y. G.O.L. § 5-601; Cal. Civ. Code § 2954.8; Minn. Stat. Ann. § 47.20, subd. 9(a).

Page 21 -  COMPLAINT

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

Massachusetts's law allows banks to determine the rate and manner that interest is paid. *See* Mass. Gen. Laws ch. 183, § 61. And only a few of the subject states prohibit maintenance fees. *Compare, e.g.*, Md. Code Ann., Com. Law § 12-109.2 (prohibiting fees), *with* Vt. Stat. Ann. tit. 8, § 10404(b). The states' laws also apply to different sets of mortgages. *Compare, e.g.*, 9-B Me. Rev. Stat. Ann. § 429(4) (applying "only to mortgages on owner-occupied residential property consisting of not more than 4 dwelling units"), *with* Md. Code Ann., Com. Law § 12-109(b)(1) (applying to "a first mortgage or first deed of trust on any interest in residential real property"). The Preemption Rule fails to recognize or account for any of these differences.

91.     In addition, the OCC does not even attempt to support the Preemption Rule with "substantial evidence, made on the record of the proceeding." 12 U.S.C. § 25b(c). The OCC has not presented any factual evidence demonstrating that state interest-on-escrow laws significantly interfere with the exercise of national banks' power to establish and administer escrow accounts. The agency has not, for example, provided any evidence showing that any state interest-on-escrow law has led to net losses on the mortgage escrow operations of national banks. To the contrary, the Preemption Rule states the agency need not provide *any* evidence for its preemption determination because "National Bank Act preemption is fundamentally a question of law." 91 Fed. Reg. at 29352; *see also id.* at 29354 ("The [section 25b(b)(1)(B)] analysis . . . does not require 'evidence of a law's real-world effects.'" (citation omitted)). Because the OCC developed no evidence to support its preemption determination, the Preemption Rule necessarily violates Dodd-Frank's substantial evidence requirement. *See Ill. Bankers Ass'n v. Raoul*, --- F.Supp.3d ----, No. 24 C 7307, 2026 WL 1534350, at *8 (N.D. Ill. June 1, 2026) ("Whatever 'substantial' evidence made 'on the record' must include, it does not appear to have been met here.").

92.     The Preemption Rule is also arbitrary and capricious because it lacks any reasonable basis in fact or law, is not reasonably explained, and fails to meaningfully consider how it will harm borrowers and the financial system.

Page 22 -  COMPLAINT

**E.    The Escrow Powers and Preemption Rules Harm Plaintiff States**

93.    State interest-on-escrow laws result in borrowers recouping thousands of dollars in interest payments every year. Plaintiffs have a sovereign interest in enforcing their interest-on-escrow laws and ensuring their residents continue receiving interest payments. Because the Escrow Powers and Preemption Rules purport to preempt Plaintiffs' statutes, Plaintiffs have standing to challenge them. *See Diamond v. Charles*, 476 U.S. 54, 62 (1986) ("[A] State has standing to defend the constitutionality of its statute."); *Washington v. U.S. Food & Drug Admin.*, 108 F.4th 1163, 1176 (9th Cir. 2024) (recognizing state sovereign standing to "challenge a federal statute that preempts or nullifies state law"); *Oregon v. Ashcroft*, 192 F. Supp. 2d 1077, 1087 (D. Or. 2002) ("Oregon has alleged and proved a sufficient injury to its sovereign and legitimate interest in the continued enforceability of its own statutes.").

**CAUSES OF ACTION**

**COUNT 1**
**Violation of Administrative Procedure Act**
**Agency Action in Excess of Statutory Authority and Contrary to Law**

**(Against Defendants the Office of the Comptroller of the Currency and Jonathan V. Gould)**

94.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

95.    The APA requires that a court set aside final agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

96.    The APA also requires that a court set aside final agency action that is "not in accordance with the law." 5 U.S.C. § 706(2)(A).

97.    The Escrow Powers and Preemption Rules exceed the OCC's preemption authority under Dodd-Frank by creating a new national bank power solely to preempt state laws and by misapplying the *Barnett Bank* standard to deem all state interest-on-escrow laws preempted. *See* 12 U.S.C. § 25b(b)(1)(B), (b)(4).

Page 23 - COMPLAINT

98. The Escrow Powers and Preemption Rules are also contrary to Supreme Court precedent requiring "a practical assessment of the nature and degree of the interference caused by a state law" and prohibiting "a categorical test that would preempt virtually all state laws that regulate national banks." *Cantero*, 602 U.S. at 220–21.

99. The Escrow Powers and Preemption Rules also violate Dodd-Frank's procedural requirements for preemption determinations by failing to support their preemption determinations with substantial evidence and by failing to conduct a case-by-case preemption analysis. *See* 12 U.S.C. § 25b(b)(1)(B), (b)(3)(A), (c).

100. For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Escrow Powers and Preemption Rules violate the APA.

101. Plaintiffs are also entitled to vacatur of the Escrow Powers and Preemption Rules.

### COUNT 2

**Violation of the Administrative Procedure Act**
**Arbitrary and Capricious Agency Action**

**(Against Defendants the Office of the Comptroller of the Currency and Jonathan V. Gould)**

102. Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

103. Under the APA, a court must set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 52 (1983) (agency action must be supported by a "rational connection between the facts found and the choice made" (citation modified)); *Ohio v. EPA*, 603 U.S. 279, 292 (2024) ("An agency action qualifies as arbitrary or capricious if it is not reasonable and reasonably explained." (citation modified)).

104. The Escrow Powers and Preemption Rules lack any factual basis, are based on unsupported speculation, and fail to meaningfully consider how they harm consumers and the financial system.

Page 24 - COMPLAINT

105.    Because the Escrow Powers and Preemption Rules are arbitrary and capricious, they violate the APA.

106.    For these reasons, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Escrow Powers and Preemption Rules violate the APA.

107.    Plaintiffs are also entitled to vacatur of the Escrow Powers and Preemption Rules.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.    Declare and hold unlawful the Escrow Powers and Preemption Rules;

b.    Vacate and set aside the Escrow Powers and Preemption Rules;

c.    Award Plaintiffs' costs of suit and reasonable attorneys' fees and expenses pursuant to any applicable law; and

d.    Award such additional relief as the interests of justice may require.

DATED August 11, 2026.

Respectfully submitted,

**DAN RAYFIELD**
Attorney General for the State of Oregon

By: *s/ Leanne Hartmann*
LEANNE HARTMANN #257503
BRIAN SIMMONDS MARSHALL #196129
JOSEPH PLATT #262461
Senior Assistant Attorneys General
GALEN KNOWLES #T26051501, WSBA 59644
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Leanne.Hartmann@doj.oregon.gov
Brian.S.Marshall@doj.oregon.gov
Joseph.Platt@doj.oregon.gov
Galen.Knowles@doj.oregon.gov

*Counsel for State of Oregon*

**LETITIA JAMES**
Attorney General of the State of New York

By: *s/ Christopher L. Filburn*
Christopher L. Filburn
*Senior Enforcement Counsel*
Christian Reigstad
*Assistant Attorney General*
Bureau of Consumer Frauds & Protection
Mark Ladov
*Special Counsel*
28 Liberty Street, 20th Floor
New York, New York 10005
Tel.: 212.416.8303
Email: christopher.filburn@ag.ny.gov
Tel. : 212.416.8321
Email: christian.reigstad@ag.ny.gov
Tel. : 212.416.8240
Email: mark.ladov@ag.ny.gov

*Counsel for State of New York*

Department of Justice
100 SW Market Street
Portland, OR 97201
9716731880 / Fax: 9716735000

**ROB BONTA**
Attorney General
State of California

By: *s/ Caroline E. Wilson*
Caroline E. Wilson
*Deputy Attorney General*
Nicklas A. Akers
*Senior Assistant Attorney General*
Tina Charoenpong
*Supervising Deputy Attorney General*
455 Golden Gate Avenue, Suite 110000
San Francisco, CA 94102-7004
Tina.Charoenpong@doj.ca.gov
Callie.Wilson@doj.ca.gov

*Counsel for State of California*


**AARON M. FREY**
Attorney General of Maine

By: *s/ Suzanne Burke*
Suzanne Burke
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME 04333
207-626-8456
Suzanne.burke@maine.gov

*Counsel for State of Maine*


**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By:  *s/ Matthew Lashof-Sullivan*
Yael Shavit
*Chief, Consumer Protection Division*
Matthew Lashof-Sullivan
Daniel Bahls
*Assistant Attorneys General*
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 963-2192
Matthew.Lashof-Sullivan@mass.gov

*Counsel for the Commonwealth of Massachusetts*


**WILLIAM TONG**
Attorney General of Connecticut

By: *s/ Rebecca Borne*
Rebecca Borne
Assistant Attorney General
165 Capitol Ave
Hartford, CT 06106
(860) 808-5400
Rebecca.Borne@ct.gov


*Counsel for State of Connecticut*


**ANTHONY G. BROWN**
Attorney General
State of Maryland

By: *s/ Lauren Gorodetsky*
LAUREN GORODETSKY
Assistant Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, MD 21202
410-576-7057
lgorodetsky@oag.maryland.gov

*Counsel for State of Maryland*


**KEITH ELLISON**
Attorney General of Minnesota

By: *s/ Christopher M. Kaisershot*
Christopher M. Kaisershot
Assistant Attorney General
Kimberly Svendsen
Special Counsel
445 Minnesota Street, Suite 600
St. Paul, MN 55101
(651) 728-4173
christopher.kaisershot@ag.state.mn.us


*Counsel for the State of Minnesota*


Page 26 -  COMPLAINT

**PETER F. NERONHA**
Attorney General for the State of Rhode
Island

By: *s/ Jordan G. Mickman*
Jordan G. Mickman (RI Bar No. 9761)
Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2079
jmickman@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

By: *s/ Jonathan T. Rose*
Jonathan T. Rose
Solicitor General
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov

*Counsel for State of Vermont*

Page 27 -  COMPLAINT